IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re ERNEST HARRIS | § | CASE NO. 03-44826-H4-13 |
| and MATTIE HARRIS, | § | |
| | § | |
| Debtors, | § | |
| | § | |
| ERNEST HARRIS | § | |
| and MATTIE HARRIS, on behalf | § | |
| of themselves | § | |
| and all other similarly situated | § | |
| Chapter 13 debtors, | § | |
| | § | ADVERSARY NO. 08-3014 |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| FIDELITY NATIONAL INFORMATION | § | |
| SERVICES INC. D/B/A FIDELITY | § | |
| NATIONAL FORECLOSURE | § | |
| & BANKRUTPCY SOLUTIONS, | § | |
| | § | |
| Defendants. | § | |

## FIRST AMENDED COMPLAINT

Plaintiffs, Ernest Harris and his wife, Mattie Harris, individually and on behalf of all other similarly situated Chapter 13 debtors, allege as follows:

## NATURE OF THE CASE

1. This case involves the undisclosed kickback/sharing of bankruptcy creditor attorney fees to a non-law firm corporate entity.

2. Mortgage servicers routinely appear in this Court seeking relief from the automatic stay or in opposition to proposed chapter 13 plans. The Mortgage servicers appear through counsel who announce their appearance on behalf of those mortgage servicers.

1

3.      But, unbeknownst to this Court, those counsel often answer not to the mortgage servicers on whose behalf they appear, rather these counsel answer to an undisclosed middleman such as the Defendants.

4.      Defendants provide what is known in the mortgage-servicing industry as default servicing.  Loans which are subject to default servicing include loans which may be subject to foreclosure and loans which are in bankruptcy.

5.      Some of the services which are provided by default servicers such as the Defendants include: 1) executing documents on behalf of the original servicer; 2) ordering and providing broker price opinions; 3) track and provide fees for payoffs and refinancings, and; 4) provide centralized billing to vendors.

6.      An additional function of default servicing is the identification and retention of legal services which may be necessary for any particular mortgage in default, *e.g.* noticing and posting a property for foreclosure or seeking relief from the automatic stay in a bankruptcy proceeding.

7.      In managing the performance of the legal services for their mortgage servicing clients, Defendants require law firms to execute a "Network Agreement," which details the agreement for services between the Defendants and the particular law firm.

8.      The claims covered in this Complaint relate to the illegal fixing of fees in the bankruptcy context and the requirement that law firms that execute the "Network Agreement" to kickback a contractual prearranged fixed portion of their attorney fees to the Defendant.

9.      In reality, the Defendants are merely middlemen who, in effect, sell the legal business of their mortgage-servicing customers, and secretly control and direct counsel who appear on behalf of those mortgage-servicer customers.

10.     For obvious reasons, these "Network Agreements," as well as the kickbacks and prearranged fixed fees which are dictated in the agreements are kept secret and the disclosure requirements of the Bankruptcy Code and Rules are ignored.

11.     Defendants' secret kickback scheme also violates the U.S. Code, which makes it a crime to knowingly and fraudulently agree to fix fees in a bankruptcy proceeding.

12.     The Harrises and the Plaintiff Class seek relief from this Court to remedy these violations.

## JURISDICTION AND VENUE

13.     This action arises out of Sections 105 and 362(k) of the Bankruptcy Code, 11 U.S.C. §§ 105 & 362(k) as well as Bankruptcy Rule 2016.

14.     The Bankruptcy Court has jurisdiction over this action under 28 U.S.C. §1334 and under the Order of Reference of bankruptcy cases and proceedings under 28 U.S.C. § 157.

15.     This is a core proceeding under 28 U.S.C. §§ 157 (a)(2)(A), (B), (K), and (O).  This adversary proceeding relates to the Chapter 13 case, *In Re Harris*, Case No. 03-44826-H4-13, In the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

## PARTIES

16.     Plaintiffs Ernest Harris and Mattie Harris are Chapter 13 debtors whose bankruptcy proceeding is pending in this Court. The Harrises assert the claims herein individually

and on behalf of a class of similarly situated Chapter 13 debtors who have been subject to the collection activities of the Defendants, their mortgage servicing customers and their stable of "network attorneys."

17.     Defendant Fidelity National Information Services, Inc. is a Delaware corporation with its principal place of business at 601 Riverside Avenue, Jacksonville, Florida 32204-2901.  Fidelity does not appear to maintain a registered agent for service of process in Texas, despite its specific contacts with Texas businesses and individuals related to this case and systematic and continuous contacts with Texas to boot.  Fidelity can be served through its registered agent for service of process, Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

18.     Defendant Fidelity National Foreclosure Solutions, Inc. (f/k/a Fidelity National Foreclosure & Bankruptcy Solutions), is a Delaware corporation with its principal place of business at 1270 Northland Drive, Suite 200, Mendota Heights, Minnesota 55120.   Fidelity National Foreclosure Solutions, Inc. can be served through its registered agent for service of process, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## FIDELITY:  SECRET PUPPETMASTER OF CREDITORS' LAWYERS

19.     Mortgage servicing companies such as Saxon Mortgage Services, Inc. ("Saxon") (the mortgage-servicing company that appeared in the Harrises' Chapter 13) and many others routinely appear in this court as creditors in Chapter 13 bankruptcies.

20.     Fidelity acts as a secret middleman between many of these mortgage companies and the law firms that appear on behalf of the mortgage servicers.  According to its

Executive Chairman, Fidelity's "Lender Processing Services" provides "comprehensive data, servicing, and technology solutions to large-scale mortgage servicing lenders."

21.    In fact, Fidelity's "comprehensive" role is really that of secret puppetmaster of the law firms that appear in this Court on behalf of mortgage servicing lenders.  These law firms (in the Harrises' case, Mann & Stevens, P.C.) collect their fees by tendering their bills through Fidelity and then on to the mortgage servicer – in this case Saxon, which then charge debtors, like the Harrises, without ever obtaining this Court's approval.

22.    Saxon either obtains cash payments of these fees or adds the indebtedness to debtor accounts.  The debtors often only become aware of this years later, typically when they sell their home or refinance, only to discover an extra few hundred or thousand dollars required to release this lien.

23.    In the Harrises proceeding, Saxon, through Fidelity, charged the Harrises both in cash and by adding to their indebtedness.

24.    The fees the Fidelity-controlled law firms charge in Chapter 13 bankruptcies are inflated by 25% to 50%.  The law firms, like Mann & Stevens, P.C., kick back the extra to Fidelity as part of Fidelity's nationwide "Network Agreement" governing its relationships with these law firms.  Again, Fidelity keeps its role, as well as the kickback, hidden from the courts as a matter of systematic policy.

25.    Fidelity's conduct is criminal under 18 U.S.C. § 155, which provides that any party in interest commits a crime when that entity or its representative "knowingly and fraudulently enters into an agreement" for the purpose of fixing the fees or other

5

compensation to be paid to any party in interest or to any attorney for any party in interest for services rendered in connection therewith, from the assets of the estate." Under section 155, this conduct is punishable by both fines and prison time.

26.     Fidelity's conduct places its "Network" attorneys in violation of multiple ethical rules forbidding fee-splitting.  For example, the State Bar Rules provide that "[a] lawyer . . shall not share or promise to share legal fees with a nonlawyer," with exceptions inapplicable here.  *See* Tex. R. Prof. Cond. 5.04(a).

27.     Fidelity's "Network Agreements" with its "Network" attorneys reflect Fidelity's systematic participation in a fee-splitting scheme that occurs routinely in Court cases but without this Court's knowledge.

28.     In addition to the criminal and ethical prohibitions against fee-splitting, the Bankruptcy Code and Bankruptcy Rules impose additional restrictions on the charging of attorneys' fees.  As this Court has concluded, Rule 2016's requirement of disclosure of fees "goes hand in glove with the overall purposes of § 506(b) – to protect estate assets from excessive fees charged by oversecured creditors and their overzealous attorneys."  *Sanchez v. Ameriquest, (In re Sanchez)*, 372 B.R. 289, 304 (Bankr. S.D. Tex 2007) (citations omitted)

29.     Rule 2016 specifically requires disclosure of fee-splitting arrangements like this. However, Fidelity deliberately keeps its fee-generation and kickback scheme (and its role as puppetmaster of creditors' lawyers) secret, thereby rendering all fees collected in connection therewith *per se* unreasonable.

30.     Fidelity's role as secret puppetmaster over creditor law firms like Mann & Stevens renders Fidelity jointly and severally liable for **all** these fees under the law of civil conspiracy.

## FIDELITY'S SECRET DEALS WITH MORTGAGE COMPANIES AND LAW FIRMS

31.     Fidelity uses two sets of agreements in its systematic secret kickback scam:  its "Default Services Agreement" with mortgage servicers like Saxon, and its "Network Agreement" with its law firms like Mann & Stevens.

32.     ***The Default Services Agreement***.   First, Fidelity obtains its "Default Services Agreements" with various mortgage servicing companies.  Figure 1 below illustrates these relationships:



Figure 1:  Fidelity's "Default Services Agreements" with Mortgage Companies

33.     Under the "Default Services Agreement," mortgage servicers cede control over their accounting and legal affairs, and the hiring of the lawyers who appear on their behalf, to Fidelity.

34.     Fidelity obtains the right and power to choose and manage and set the fees for the law firms that will appear on behalf of the mortgage servicing company.

35.     Fidelity and each mortgage servicer signatory to the Default Services Agreement agree to keep the terms of the agreement secret.

36.    Again, Fidelity never appears as a party.  Thus, when mortgage servicers like Saxon appear in this Court, their lawyers act at the behest of their secret puppetmaster, Fidelity, about whose role this Court knows little or nothing.

37.    Fidelity's operation in the shadows ensures that this Court never deals with the real decision maker – Fidelity.

38.    Because Fidelity shrouds in darkness its role as the secret client directing mortgage servicer law firms like Mann & Stevens, Fidelity deserves special scrutiny from this Court.  And because Fidelity keeps its role a secret, ***none*** of the attorney's fees it causes Saxon to collect (both those kicked back to it and those that "Network" attorneys keep) satisfy the disclosure or approval requirements of Rule 2016 and this Court.

39.    Moreover, because Fidelity keeps its role a secret while ***exercising control*** over its "Network" attorneys such as Mann & Stevens, the law of civil conspiracy makes Fidelity liable for disgorgement and/or reversal of charges of ***all*** fees in which Fidelity received a kickback.

40.    ***<u>The "Network Agreement" Between Fidelity and "Network" Law Firms</u>***.  When Fidelity hires law firms like Mann & Stevens to represent mortgage servicers like Saxon, Fidelity uses systematic, standardized, and secret retention agreements, called "Network Agreements," to govern how those firms will represent Saxon (again, with Fidelity in the shadows), as depicted in Figure 2:



Figure 2:  Fidelity's Law Firm "Network"

41.     Using this "nationwide network" of law firms, combined with the claims of mortgage service companies like Saxon, Fidelity skims bankrupt debtors through its kickback scheme.  Under its "Network Agreements," each of Fidelity's "Network" law firms charges fees for litigating claims against Chapter 13 debtors, but kicks back a portion of those fees to Fidelity.  Again, this Court never learns of Fidelity, let alone the kickbacks.

**<u>THE HARRISES – FIDELITY'S SCHEME IN ACTION</u>**

42.     The Bankruptcy Code forbids creditors like Fidelity/Saxon from collecting post-petition attorneys' fees without full disclosure and scrutiny.  But the secret kickbacks of attorneys' fees to the well-hidden Fidelity presents violations far worse than the garden-variety scams that this Court has begun to address in the past few months.

**Fidelity/Saxon's Objection to Harrises' Plan:**
**$200 in Attorneys' Fees, $50 Kicked Back to Fidelity**

43.     Creditor objections to debtors' proposed Chapter 13 plans provides an opportunity for Fidelity to skim money from debtors in many cases.  For example, in the Harrises' case, in December 2003, Fidelity (acting through Saxon and Mann & Stevens) filed an objection to the Harrises' Chapter 13 plan before the plan was confirmed.

44.     Mann & Stevens charged Saxon $200 for this work, pursuant to Fidelity's "Network Agreement."

45.     Saxon paid Mann & Stevens the $200.00 attorney fee, charged the Harrises $200.00 and then, under the "Network Agreement," Mann & Stevens kicked back $50 of that fee to Fidelity – secretly, outside the detection of this Court.

46.     Fidelity kept this kickback secret because it knew full well that this Court, the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure forbids that practice.

47.     The addition of the full $200.00 to the Harrises' mortgage account had the effect of (1) increasing the debt of the Harrises and of their bankruptcy estate, and (2) increasing the amount of estate property necessary for the Harrises to enjoy a true fresh start through their bankruptcy proceeding.  In this way, the Harrises and other debtors have little inkling that, upon a refinancing or a sale, the mortgage company will tell them that they have to pay hundreds or thousands more to release their lien, or that upon receiving their discharge that they will be liable for those amounts in order to have a current mortgage.

**Fidelity/Saxon's Motion for Relief from Stay:**
**<u>$650 in Attorneys' Fees, $150 Kicked Back to Fidelity</u>**

48.     Another example of Fidelity's fee-splitting occurs when Fidelity files, again through its "Network Attorneys" and mortgage servicing companies like Saxon, motions for relief for automatic stay in which Fidelity/mortgage servicing co. allege the debtor missed payments, failed to carry insurance on a home, or committed other acts of default.

49.     Again, that is what happened with the Harrises.  Fidelity/Saxon and Fidelity's "Network" law firm of Mann & Stevens, filed a motion for relief from the automatic stay against the Harrises in April 2004.

50.     On information and belief, Saxon paid Mann & Stevens $650 in fees for this work. Fidelity/Saxon charged the Harrises for these fees and collected these fees in six monthly installments of $148.55 (charging interest for the extra time) pursuant to an Agreed Order.

51.     However, under the "Network Agreement," Mann & Stevens secretly kicked back $150 of that fee to Fidelity.

52.     The $650.00 was disclosed and was contained in the Agreed Order, but neither Saxon nor Mann & Stevens ever disclosed the $150.00 kick-back to Fidelity.

**CLASSWIDE INJUNCTIVE RELIEF AND**
**CORRESPONDING DECLARATORY AND EQUITABLE RELIEF**
**<u>(CREDIT, REFUND, AND DISGORGEMENT)</u>**

53.     Multiplying the amounts the Harrises paid times thousands of debtors, it amounts to hundreds of thousands (if not millions) of dollars for conduct that perniciously undermines this Court's jurisdiction and the integrity of the bankruptcy system.

11

54. The individual charges are small in principal, but extremely large when viewed within all the chapter 13 proceedings in the Southern District of Texas.

55. Indeed, this problem – Fidelity's express and systematic receipt of kickbacks and secret control of law firms who appear before this Court as representing others – presents an ongoing assault on the Harrises, the class, and this Court's jurisdiction for which no adequate remedy at law exists.

56. The Harrises and the plaintiff class are entitled to an equitable decree enjoining Fidelity from making any further efforts to collect fees with kickbacks, as well as corresponding declaratory and equitable relief (i) reversing the existing charges that remain on the Harrises account, and (ii) disgorging the monies Fidelity has already collected from them.

57. This decree is central to remedying Fidelity's conduct, both as to the Harrises and to the class.

58. This Court can easily oversee Fidelity's accounting and computation of this relief by means of objective data from Fidelity's own records.  The tabulation will follow the format below:

| Debtor | Injunction | Declaration reversing charges | Declaration/equitable relief disgorging fees collected |
|--------|-----------|-------------------------------|--------------------------------------------------------|
| Chapter 13 Debtors Ernest and Mattie Harris | Uniform and classwide relief from Fidelity's continued systematic practice of collecting fees with kickbacks | $200 plus interest for fees that Fidelity placed on Harrises' account* | $819.13 plus interest for fees Harrises paid* |
| Chapter 13 Debtor John Doe | Uniform and classwide relief from Fidelity's continued systematic practice of collecting fees with kickbacks | $___ (per Fidelity's database) for fees that Fidelity placed on debtor John Doe's account | $___ (per Fidelity's database) for fees paid |
| Chapter 13 | Uniform and | $ ___ (per Fidelity's database) | $___ (per Fidelity's database) |

| | | | |
|---|---|---|---|
| Debtor Jane Doe | classwide relief from Fidelity's continued systematic practice of collecting fees with kickbacks | for fees that Fidelity placed on debtor Jane Doe's account | for fees paid |
| Chapter 13 Debtor John Smith | Uniform and classwide relief from Fidelity's continued systematic practice of collecting fees with kickbacks | \$___ (per Fidelity's database) for fees that Fidelity placed on debtor John Smith's account | \$___ (per Fidelity's database) for fees paid |
| … | … | … | |
| **TOTAL** | Uniform and classwide relief from Fidelity's continued systematic practice of collecting fees with kickbacks | \$___ (per Fidelity's database) for fees that Fidelity placed on debtors' accounts | \$___ (per Fidelity's database) for fees paid |

*Based on Mann & Stevens's invoices

59.     Fidelity has a sophisticated data-management system that makes computing the relief simple.  This Court can and should remedy Fidelity's misconduct by use of the same classwide tools with which Fidelity carried it out.

## CLASS ALLEGATIONS

60.     Plaintiffs bring this action individually and on behalf of all others similarly situated as members of a proposed plaintiff class pursuant to Fed. R. Bankr. P. 7023.

61.     The class that plaintiffs seek to represent consists of all Chapter 13 debtors in the Southern District of Texas who are (a) presently subject to any claim of any kind by Fidelity, Fidelity's clients, and/or Fidelity's Local Counsel/"Network" Attorneys and (b) against whom Fidelity and its Network Attorneys have kicked back attorneys' fee payments from attorneys pursuant to Fidelity's Network Agreements.

62.     This action may be properly maintained as a class action pursuant to Fed. R. Bankr. P. 7023.

63. The members of the class are so numerous that joinder of their individual claims is impracticable.   The precise number of class members and their addresses are presently unknown to plaintiffs but are easily obtained from Fidelity's systematically maintained "Fidelity Software," under which Fidelity tracks its "Network" attorneys' activities.

64. Class members can be notified of the pendency of this action by publication in newspapers, by mailed notice, and by other means.

65. Fidelity intentionally operates its "Network" attorney fee-collection and fee-kickback scheme on a systematic, class-wide basis.

66. Fidelity used systematic recordkeeping software, policies, and procedures to effectuate its secret and illegal scheme of collecting attorneys' fees without court approval and receiving systematically calculated kickbacks of those fees, again without court approval and with knowledge that no court would ever tolerate Fidelity's practice.

67. Therefore, common questions of law and fact exist as to all members of the class. These common questions predominate over questions affecting only individual class members.

68. The Harrises' claims are typical of the claims of the members of the class they seek to represent.

69. The Harrises and the class members are Chapter 13 debtors in whose bankruptcy proceedings Fidelity hired "Network" attorneys to appear on behalf of mortgage servicers asserting claims against the debtor class.

70.     Fidelity used the same secret fee-collection and fee-splitting/kickback scheme against the Harrises and the class members on a systematic basis.

71.     The Harrises adequately represent the class.

72.     Their interests do not conflict with the interests of the class members they seek to represent.

73.     Plaintiffs have retained counsel who are competent and experienced in complex class action and bankruptcy litigation.

74.     The Harrises are committed to seeking a classwide injunction, with corresponding classwide declaratory and equitable relief, because any mere monetary recovery on their existing claims would do nothing to stop Fidelity from committing the same violations in the future against them and the rest of the class.

75.     The Harrises understand from their own experience that debtors like themselves are highly vulnerable and depend upon the integrity of the bankruptcy courts to help them preserve what precious little they have.  Nothing short of classwide injunctive relief will work.

76.     Finally, the Harrises and their counsel intend to prosecute this action vigorously.

77.     The interests of the members of the class will be fairly and adequately protected by plaintiffs and their counsel.

78.     The interests of the Harrises are coincident with, and not antagonistic to, those of the class members.  Without representatives like the Harrises, Fidelity would continue to undermine and subvert this Court's jurisdiction and mulct Chapter 13 debtors in willful defiance of the law.

79.     The class action device is far superior to other available means for the fair and efficient adjudication of the claims of plaintiffs and of the class.

80.     Judicial management of this litigation is essential because of the pernicious and secretive conduct of Fidelity in Chapter 13 bankruptcies that jeopardizes, on a systematic basis, the integrity of the bankruptcy process and this Court's jurisdiction.

81.     This class action is the only method by which all of the class members' common claims can economically and expeditiously be adjudicated in one proceeding and thereby preclude the possibility of multiple trials and inconsistent judgments throughout this District.

**COUNT 1**

**VIOLATION OF RULE 2016(a)**
**(INJUNCTIVE RELIEF UNDER BANKRUPTCY CODE § 105(a) AND**
**CORRESPONDING DECLARATORY AND EQUITABLE RELIEF)**

82.     The Harrises incorporate the allegations set forth above as if set forth in full herein.

83.     Fidelity's secret receipt of fees from its Network Attorneys constitutes a violation of Fed. R. Bankr. P. 2016(a).

84.     Rule 2016(a) specifically requires creditors seeking reimbursement of expenses to disclose "agreement[s]" or "understanding[s]" regarding "sharing of compensation received or to be received for services rendered in or in connection with the case, and the particulars of any sharing of compensation or agreement or understanding therefor."

85.     Fidelity violates Rule 2016(a) systematically and as a matter of corporate policy; it is codified in Fidelity's own agreements with its Client/Mortgage Servicers and its "Network Attorneys," as well as in the policies, procedures, software, and

16

management structure by which Fidelity executes its secret fee-collection, fee-splitting/kickback scheme.

86.     In case after case, Fidelity fails to apply for the fees it collects, fails to disclose its fee-splitting arrangement with the lawyers it controls, and conceals its very existence from this Court, again as a matter of corporate policy.

87.     Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 2016(a), the Harrises and the plaintiffs class they represent seek an equitable decree from this Court that enjoins Fidelity from continuing its illegal collection of fee-splitting charges in violation of Rule 2016(a) and corresponding declaratory and equitable relief (i) reversing all attorneys' fees charged that contain a kickback and (ii) refunding and disgorging any such fees (and interest thereon) that Fidelity has already collected.

**COUNT 2**

**VIOLATION OF AUTOMATIC STAY**
**(WITH INJUNCTIVE RELIEF UNDER BANKRUPTCY CODE § 105(a) AND**
**CORRESPONDING DECLARATORY AND EQUITABLE RELIEF)**

88.     The Harrises incorporate the allegations set forth above as if set forth in full herein.

89.     Under 11 U.S.C. § 362(a)(3), creditors are forbidden from engaging in any act to obtain property of the estate.

90.     Fidelity's secret and illegal fee-collecting and fee-splitting/kickback scheme and participation in collection of all undisclosed and unapproved fees constitute systematic acts to obtain property of the estate of each Chapter 13 debtor in the class.

91.     Based on the violations of the automatic stay, the Harrises and the plaintiff class they represent seek an equitable decree from this Court that enjoins Fidelity from continuing its illegal fee-splitting practices in violation of 11 U.S.C. § 362(a)(3), and

corresponding declaratory and equitable relief (i) reversing all attorneys' fees charged that contain a kickback and (ii) refunding and disgorging any such fees (and interest thereon) that Fidelity has already collected.

92.     Under 11 U.S.C. 362(h)[1], the Harrises and the plaintiff class action are also entitled to their attorneys' fees and costs their counsel have incurred in the investigation and prosecution of Fidelity's willful and willfully concealed classwide violation of the automatic stay.

93.     Fidelity is liable to the debtor class for punitive damages under § 362(h) because it acted in bad faith and/or with actual knowledge that it was violating a federally protected right or with reckless disregard of whether it was doing so.

94.     Because this case involves Fidelity's systematically hidden, knowing and willful conduct in deliberate and flagrant violation of the Bankruptcy Code, Fidelity's conduct warrants the imposition of punitive damages in the amount of at least three times the other monetary relief this Court awards the plaintiff class and its counsel, as provided under 11 U.S.C. 362(h).

## COUNT 3

## CIVIL CONSPIRACY

95.     The Harrises incorporate the allegations set forth above as if set forth in full herein.

96.     Fidelity and its mortgage-servicer clients such as Saxon and its "Network" attorney such as Mann & Stevens have knowledge of, have agreed to, and have intended a

---

[1]     This complaint refers to § 362(h) because that provision applies to the Harrises' Chapter 13 proceeding, filed in 2003, before Congress corrected the Bankruptcy Abuse and Consumer Protection Act of 2005 ("the Reform Act"), which addressed § 362 so that old § 362(h) becomes § 362(k). However, the Reform Act provides, with immaterial exceptions, that it "shall not apply with respect to cases commenced under title 11, United States Code, before the effective date of this Act." *See, e.g., In re McKinney*, 457 F.3d 623, 624 (7th Cir. 2006).

common objective and course of action of reaping secret fees from debtors that has resulted in systematic monetary injury to debtors such as the Harrises.

97.   On information and belief, the conspiracy continues to this day.

98.   Fidelity knows that each time Saxon or another of its mortgage-servicer clients charges debtors' accounts for attorney's fees with a contractual kickback to Fidelity, that charge is false, wrongful, and forbidden under the Bankruptcy Code, Bankruptcy Rules, State Bar Rules, and Federal criminal code.

99.   Fidelity systematically conceals all these fees – both the portions of fees that Fidelity's "Network Attorneys" kickback to Fidelity as well as the fees that Fidelity permits its "Network Attorneys" to keep – from the Court.

100.   Fidelity, through its "Network Agreements" and "Default Services Agreements," undertakes central acts in furtherance of its conspiracy through, among other things, (1) hiding behind the identity of its mortgage-company clients like Saxon, and using Saxon's name, in charging these fees; and (2) using systematic policies governing its "Network" attorneys like Mann & Stevens as puppets with which Fidelity can create this massive revenue stream, disguised as fees.

101.   Fidelity knows that the source of this secret revenue stream comes from the Chapter 13 debtors during the bankruptcy proceedings over which this Court maintains exclusive jurisdiction.

102.   Fidelity knows that debtors like the Harrises shoulder these burdens wholly ignorant of Fidelity's secret scheme.  Fidelity knows that it and its mortgage-servicer clients generate this fee revenue free from the scrutiny of this Court.

103.   Fidelity knows that this Court would never permit a creditor to generate attorney-fee revenue let alone pay kickbacks dictated by Fidelity to its "Network" attorneys – in such flagrant violation of the law.

104.   Because Fidelity's active and central role in the civil conspiracy to collect these fees, this Court's decree should hold Fidelity jointly and severally liable for all fees that the Harrises and the class have paid to Mann & Stevens and the other puppet-like "Network" attorneys who purport to represent mortgage lenders while Fidelity secretly pulls their strings.

### **Prayer for Relief**

105.   Based on the foregoing, the Harrises and the plaintiff class pray that this matter be called to trial and, upon the presentation of its evidence, the Court award against Fidelity:

a.   An equitable decree from this Court that enjoins Fidelity from continuing its illegal fee-splitting practices;

b.   Corresponding declaratory and equitable relief (i) reversing all attorneys' fees charged that contain a kickback and (ii) refunding and disgorging any such fees (and interest thereon) that Fidelity has already collected from them;

c.   Attorneys' fees and costs that the Harrises' counsel have incurred in the investigation and prosecution of this matter;

d.   Prejudgment and postjudgment interest as allowed by law; and

e.   Punitive damages of no less than three times the value of the reversed charges, interest, and refunds, reimbursements, and disgorgement awarded to the Harrises and the plaintiff class.

Dated this 11th day of April, 2008.

Respectfully submitted,

By: _/s/ Johnie Patterson_
       Johnie Patterson
       attorney-in-charge
       SBN 15601700
       Michael G. Walker
       SBN 20717580
       Miriam Goott
       SBN 24048846

OF COUNSEL:
WALKER & PATTERSON, P.C.
P.O. Box 61301
Houston, TX 77208
(713) 956-5577 (telephone)
(713) 957-3358 (fax)
jjp@walkerandpatterson.com
mwalker@walkerandpatterson.com
mgoott@walkerandpatterson.com

By: _/s/ David K. Bissinger_
       David K. Bissinger
       State Bar No. 00790311
       Gerald S. Siegmyer
       State Bar No. 18343300

OF COUNSEL:
SIEGMYER, OSHMAN & BISSINGER LLP
2777 Allen Parkway, 10th Floor
Houston, Texas 77019
(713) 524-8811 (Telephone)
(713) 524-4102 (Facsimile)
dbissinger@bizlawhouston.com
gsiegmyer@bizlawhouston.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I, Johnie Patterson hereby certify that a true and correct copy of the above *First Amended Complaint* has been forwarded to the following counsel of record via electronic transmission, on the 11th day of April, 2008:


Michael P. Cash
Joseph G. Epstein
WINSTEAD PC
1100 JP Morgan Chase Tower
600 Travis Street
Houston, Texas 77002
Email: mcash@winstead.com and jepstein@winstead.com
Facsimile: 713-650-2400

Mark S. Melodia
Kurt F. Gwynne
Barbara K. Hager
Thomas Levinson
REED SMITH LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103
Email: mmelodia@reedsmith.com,
kgwynne@reedsmith.com, bhager@reedsmith.com
and tlevinson@reedsmith.com
Facsimile: 215-851-1420


  */s/ Johnie Patterson*
Johnie Patterson

## NETWORK AGREEMENT

**THIS NETWORK AGREEMENT** ("Agreement") is made between Fidelity National Foreclosure & Bankruptcy Solutions, a division of Fidelity National Title Company, a Delaware corporation ("Fidelity") and Mann & Stevens, P.C. (the "Firm") (collectively the "Parties").

**WHEREAS,** the Firm wishes to provide to Fidelity and its Clients various legal services that may include matters related to mortgage foreclosures and bankruptcies, as well as other loan default services in Texas (the "Jurisdiction");

**WHEREAS,** Fidelity wishes to provide the Firm various administrative services related to mortgage foreclosures, bankruptcies, and other loan default services; and

**WHEREAS,** each Party wishes to provide these services to the other on the terms and conditions set forth below;

**NOW, THEREFORE,** the Parties agree as follows:

**Section 1.**    <u>Services</u>. During the term of this Agreement (the "Services Period"), each Party shall provide the other with the services set forth in Exhibit A ("the "Services"). The Parties agree to use their best efforts to provide Services in a timely and professional manner. The Parties may periodically agree in writing to add or delete Services listed in Exhibit A. When Services are added, they shall become "Services" for purposes of this Agreement. All Services provided by the Firm shall be in accordance with applicable security instrument(s), as well as federal, state and local laws and practice. The Firm is responsible for identifying any actual or potential conflict of interest during the term of representation. If the Firm does not perform according to the terms outlined below, Fidelity reserves the right to immediately remove existing files from the Firm in accordance with Section 15 below and discontinue referring new files or other legal matters to the Firm.

**Section 2.**    <u>Referrals</u>. The Firm acknowledges that Fidelity has the right to enter into Network Agreements with other law firms at any time. Fidelity may decide which default matters are to be referred to the Firm ("Referrals") and is not obligated to make a minimum number of Referrals to the Firm. By accepting Referrals, the Firm agrees to the terms of this Agreement and waives any right to assert attorney liens or similar charging liens for payment of services or otherwise against such files. However, the Firm shall be entitled to invoice for the services rendered to date on the file(s) and costs. If Fidelity and/or the Client subsequently terminates an individual referral, the transfer provisions of Section 15 below shall apply.

**Section 3.**    <u>Fees</u>.

      (a)    The fees for Services performed are set forth in Exhibit B, Exhibit C, and Exhibit D (the "Fees"). These Fees are based upon governmental, quasi-

Saxon 0191

governmental agency, or contractual guidelines as of September 1, 2001. The Parties may mutually agree in writing to amend Exhibits B, C and D. Except as specifically provided in Exhibits B, C and D, all Services shall be performed for flat Fees. If FNMA, FHLMC, FHA, and/or the VA revise their fee guidelines, or a contract is revised, the revised fee guidelines shall become "Fees" for purposes of this Agreement and shall apply to all Referrals on or after the effective date of the revised fee guidelines.

(b)     If Exhibits B, C, or D provide for the conversion to an hourly fee, with the exception noted in 3(c) below, such conversion may occur only after Fidelity or the client has given prior written approval.

(c)     The Firm may convert to an hourly fee when, in its discretion, it determines that there is a strong likelihood that Fidelity and/or the Client will suffer irreversible loss if immediate action is not taken. If the Firm makes such a determination, it shall seek Fidelity's approval for the conversion within one business day. If Fidelity does not respond in a timely manner, the Firm may contact the client. If Fidelity denies approval, the Firm is nevertheless entitled to bill the emergency work completed to that point on an hourly fee basis.

(d)     The Firm recognizes that interest and expenses accrue daily on each Referral. Any reasonable penalties assessed by the Client pursuant to governmental penalties for delays resulting solely from the Firm's actions or inaction will be paid by the Firm. Without limiting any other provisions of the Agreement, this provision, together with Section 15 below, shall survive termination of the Agreement by either Party.

**Section 4.**     Expenses.  The Firm agrees to advance all fees necessary to meet the costs and expenses required in handling the matters assigned. The Firm agrees that expenses for telephone calls, express or certified mail, postage, copying, faxing, courier charges, electronic research (Lexis, WestLaw, etc.), PACER and/or Banko charges, travel time and related expenses, and mileage are not reimbursable unless required by law, case law or approved by the Client. If any of these charges are required by statute, the Firm shall so indicate.

**Section 5.**     Payment for Services.  All invoices for services and costs are to be submitted electronically by the Firm via the NewInvoice invoice processing system, or such other electronic invoice processing system required by the Client. The Firm will be paid on its invoices directly by the Client. In no event shall Fidelity be deemed to be a guarantor of, or otherwise responsible for, any obligation of the Client. Within the thirty (30) days following each Referral, the Firm will be invoiced separately by Fidelity for the administrative fees set forth in Exhibits B, C and D. Said invoices shall be due and payable within thirty (30) days of receipt by the Firm. In the event the Client does not pay an invoice generated by the Firm due to an negligence or an error of Fidelity, the Firm shall not be required to pay Fidelity on its invoice on that referral.

**Section 6.** **Insurance.** The Firm agrees to maintain in full force and effect a Professional Liability Policy. The minimum amount of coverage shall not be less than One Million Dollars ($1,000,000.00) per occurrence. The Firm shall provide proof of Insurance to Fidelity on an annual basis and at such other times as may reasonably be requested. The Firm shall immediately notify Fidelity in writing of any changes in coverage, or impending termination, expiration, or lapse of Insurance.

**Section 7.** **Representation of Client.** For purposes of this Agreement, Fidelity's servicer/investor clients (the "Client") shall be considered the mutual clients of both Fidelity and the Firm. Fidelity shall be considered the agent of each servicer/investor Client. The Firm will never be prohibited from directly contacting any Client where, in the professional opinion of the Firm, such contact is necessary. Whenever possible, the Firm shall order title from Fidelity National Title/Chicago Title/Alamo Title/Ticor Title/Security Union Title.

**Section 8.** **Communication Between Parties.**

(a) General Communication. The Firm shall update AMOS web or Lenstar, when applicable. The Firm shall provide written or electronic status reports on Referrals as reasonably required by Fidelity. The Firm shall respond to all written or oral requests from Fidelity Account Representatives within one business day. Likewise, Fidelity shall respond to all written or oral requests from Firm employees within one business day. Fidelity reserves the rights and remedies available at law or in equity for the Firm's failure to perform any of its obligations hereunder.

(b) Updates. Fidelity shall periodically provide the Firm policy and procedure changes in the form of a Fidelity Network Update ("Update"). The Update shall be sent to the Firm either by facsimile or electronic mail. The Update shall be sent to the facsimile number or e-mail addresses noted in the Notice Section below. The Firm agrees to incorporate these Updates with the existing policies and procedures. The terms of any Update shall apply to the Parties as of the effective date indicated in the Update. The Firm takes full responsibility for disseminating the information to its staff. The Firm shall promptly bring to the attention of Fidelity any issue, claim or dispute which may have important legal, public relations or policy implications for the Client.

**Section 9.** **Annual Information.** The Firm shall provide Fidelity with the following information on an annual basis: (a) Firm resume; (b) a list of all personnel working on Referrals, along with each individual's title; (c) a list of the status of all attorneys and professionals with the Firm, including bar registrations, and any disciplinary notices or proceedings; and (d) a letter certifying that the statements in Section 12(i) and (ii) are correct.

**Section 10.** **Complete Information.** Fidelity shall fully cooperate with the Firm and make a good faith effort to promptly provide the Firm with all relevant

Saxon 0193

information on each Referral. The Firm will review the information provided to ensure that it is sufficient to process each Referral. If the Firm believes that the information is incomplete, the Firm will immediately request the missing information from Fidelity. A referral from Fidelity shall not be considered complete until all missing information is received from Fidelity or the Client

Section 11.    Confidentiality. Privileged information supplied to the Firm by Fidelity shall be kept confidential in accordance with applicable rules of professional conduct. Notwithstanding anything in this Agreement to the contrary, the Firm shall comply with all privacy and data protection laws, rules, and regulations which are or which may in the future be applicable to the Services. The Firm agrees that it will keep confidential and will not use nor disclose to any other party any nonpublic personal information which it receives from or on behalf of the Client in connection with providing Services under this Agreement, except to perform Services under this Agreement. The term "nonpublic personal information" shall have the meanings set forth in Section 509 of the Gramm-Leach Bliley Act (P.L. 106-102)(15 U.S.C. Section 6809) and implementing regulations thereof. These obligations shall survive termination of this Agreement.

Section 12.    Equal Opportunity. The Parties agree that they shall not discriminate against any employee or applicant for employment because of race, creed, color, age, sex, national origin, marital status, liability for service in the armed forces, disability due to veteran status, status as a veteran of the Vietnam era, or the handicapped. The Parties further agree that they shall comply with all the requirements of the Equal Opportunity Clause set forth in Executive Order 11246, as amended, and its implementing instructions, as well as the Rehabilitation Act of 1973 and the Vietnam Era Veterans' Readjustment Assistance Act of 1974. The Parties certify they do not and shall not maintain facilities for their employees in a segregated manner or permit their employees to perform their services at any location under their control where segregated facilities are maintained.

Section 13.    Authorization; Binding Agreement; Good Standing. Fidelity and the Firm each have full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement has been duly executed and delivered by the Firm and Fidelity and constitutes a legal, valid and binding obligation, enforceable against the Firm and Fidelity according to its terms. Neither the Firm, nor any partner, member, officer, attorney or employee of the Firm (i) has been or is currently under investigation by any governmental authority or professional organization for any alleged violation or breach of applicable rules or code of professional responsibility, any applicable codes of ethics, or any applicable rules of moral or ethical conduct that are promulgated by a state court, regulatory agency or professional licensing entity, or (ii) has been convicted of or is under investigation for any crime involving moral turpitude. The Firm will comply with all laws, rules and codes described in (i) and (ii) above, and shall immediately notify Fidelity if the Firm, or any of its representatives, is being investigated for or violates any law or applicable rule of professional conduct.

Saxon 0194

**Section 14.**   <u>Notices</u>.  Any notices required by this Agreement shall be in writing and delivered by registered mail, overnight courier service, telex, telegraph or telefax communication, addressed as follows:

In the case of Fidelity:

Fidelity National Foreclosure & Bankruptcy Solutions
1270 Northland Drive, Suite 200
Mendota Heights, MN 55120
Attention:  Lawrence C. Dingmann, Jr.
Telefax:  (651) 234-3601
E-mail:  larry.dingmann@fnfs.net

In the case of the Firm:

Mann & Stevens, P.C.
550 Westcott Street, Suite 560
Houston, Texas  77007
Attention:    Diana Stevens
Telephone:   (713) 293-3600
Telefax:       (713) 293-3636
E-mail:          dstevens@bmstexas.com and jmann@bmstexas.com

or at such other address or persons as a Party may designate in writing. All confidential correspondence must be sent to both Diana Stevens and June Mann by email and may not be sent via facsimile.

**Section 15.**   <u>Termination</u>.  If a Party breaches any term or condition of this Agreement, or fails to perform any obligation contained in this Agreement, then the non-defaulting Party may <u>immediately</u> terminate this Agreement upon written notice.  This Agreement is also terminable upon 30 days written notice by either Party at any time for any reason.  If the Firm terminates this Agreement, it will take such reasonable steps as are necessary to protect the interests of both Fidelity and the Client.  If the Firm is directed to return any or all files, the Firm shall do so within five (5) full business days from receipt of said request, along with a substitution of attorney / substitution of trustee. All original documents, correspondence, and pleadings shall be returned with the file, at no expense to either Fidelity.  The Client shall be responsible for all shipping charges.  In addition, upon completion of the file by substitute counsel, the Firm shall render a final bill for its fee in accordance with the attached Schedule D.  The Firm acknowledges that the Firm's legal file, together with all documents, papers and funds held in connection with any of the Services provided, remain the sole property of the Client and must promptly be returned to Fidelity upon termination.  In the event the Firm refuses to

Saxon 0195

promptly return said files as requested, the Firm agrees it will be liable for any reasonable loss incurred solely by the Firm.

**Section 16.** **Indemnification.** The Firm agrees to indemnify and hold harmless Fidelity and its Clients ("Indemnified Parties") to the extent sent forth herein. The Firm will fully reimburse the Indemnified Parties for any losses, liabilities, penalties, damages, expenses, or other harm or injury which the Indemnified Party may incur or suffer, or which may be asserted by any person or entity, including, but not limited to, reasonable attorney's fees and court costs proximately caused solely by negligence or intentionally wrongful conduct of the Firm. The Firm also agrees to indemnify the Indemnified Parties for failure to meet any predetermined time frames/deadlines and procedures, as established by the Client, proximately caused solely by negligence or intentionally wrongful conduct of the Firm.

(a)     **Outside Counsel.** The Firm assumes all responsibility for the acts and omissions of any outside counsel or "of counsel" retained by the Firm (for example, counsel retained to assist in litigation or counsel retained to make court appearances in remote counties). The Firm assumes all responsibility for any subcontractor or independent contractor engaged directly by the Firm.

(b)     **Excess Fees.** The Firm shall reimburse the Client for any fees which are in excess of the agreed schedule of fees or which exceed any amount allowed by applicable governmental guidelines ro not agreed to by the Client. Overcharges, or penalties resulting from violations or errors will be the sole responsibility of the Firm.

**Section 17.** **Successors and Assigns.** This Agreement is binding upon and inures to the benefit of the Parties and their respective partners, heirs, executors, administrators, representatives, successors, and permitted assigns.

**Section 18.** **Assignment.** No rights or obligations of either Party may be assigned to any other person or entity without the prior written consent of the other.

**Section 19.** **Miscellaneous.** This Agreement contains the entire understanding of the Parties. No provision may be altered, amended, modified, waived or discharged in any way, except by written agreement of both Parties. If any provision of this Agreement is found to be void or unenforceable, the remainder of this Agreement shall not be affected.

**Section 20.** **Termination of Prior Agreement.** This Agreement, including all Exhibits, contains the entire Agreement between the Parties relating to the subject matter hereof. All prior Agreements and all prior negotiations, representations, and communications relating to the same subject matter are superseded by this Agreement, except as to provisions relating to Fidelity's obligation to pay Mann & Stevens, P.C. for invoices generated between ~~April~~ March 8, 2000 and August 31, 2001..

Saxon 0196

IN WITNESS WHEREOF, the Parties have executed this Agreement this 1ˢᵗ day of September, 2001.

**FIDELITY NATIONAL FORECLOSURE &**
**BANKRUPTCY SOLUTIONS, a division of**
**FIDELITY NATIONAL TITLE COMPANY**

Lawrence C. Dingmann, Jr.
Vice President and Division Counsel

MANN & STEVENS, P.C.

By: _Diane Estala Stevens_
Diana Estala Stevens
President and Shareholder

**EXHIBIT A**

*FIDELITY NATIONAL FORECLOSURE SOLUTIONS  NETWORK SCHEDULE OF SERVICES*

STATE:   Texas
FIRM:    Mann & Stevens ("Firm")
DATE:    October 2, 2007

SECTION I.     SERVICES PROVIDED BY THE FIRM TO FIDELITY

    A.  The Firm shall provide Fidelity and its clients with competent legal representation on all Referrals, including adherence to appropriate standards of professional conduct;

    B.  The Firm shall provide Fidelity and its clients with legal representation in a manner consistent with, and in compliance with, Fidelity's standards and procedures;

    C.  The Firm shall provide Fidelity and its clients with expertise and knowledge related to the law and legal practice in the Jurisdiction and notifying Fidelity of changes in law related to the law and practices related to the Referrals;

    D.  In the state of Texas, the Firm shall institute foreclosure proceedings in such manner as is required by the applicable investor guidelines, and take all the steps necessary to bring the foreclosure to sale within 60 days after the matter is referred by Fidelity to the Firm, unless either: (i) the borrower files for bankruptcy; or (ii) Fidelity and the Firm mutually agree an event has occurred which has caused a permissible delay in the foreclosure;

    E.  In connection with bankruptcy Referrals, the Firm shall, upon request by Fidelity: (i) attend 341 hearings; (ii) object to the debtor's plan; (iii) file a motion for adequate protection; (iv) file a motion for relief from stay; (v) process a consent order/stipulation; (vi) prepare and send demand letters; and (vii) process other reasonable requests by Fidelity;

    F.  The Firm shall follow these timeframes for bankruptcy Referrals: (i) file a motion for relief from stay within 5 days after receipt of the Referral, unless a particular client requires a different timeframe; (ii) communicate motion filing and hearing results to Fidelity within 24 hours, and email final orders immediately upon receipt; and (iii) obtain relief from stay within 45 days after receipt of the Referral, unless Fidelity and the Firm agree an event has occurred which has caused a permissible delay in the bankruptcy;

    G.  In connection with replevin actions, the Firm shall follow the timeframes and communication requirements as provided by Fidelity's standards and procedures; and

    H.  The Firm shall update AMOS web or Lenstar, where applicable.

SECTION II.     SERVICES PROVIDED BY FIDELITY TO THE FIRM

    A.  Fidelity shall maintain a national network ("Network") of service oriented attorneys who handle Referrals;

    B.  Fidelity shall develop and implement marketing services to obtain clients for the Network;

    C.  Fidelity shall prepare and deliver  complete Referral packages to the Firm;

    D.  Fidelity shall monitor the Referrals for compliance with investor and client due diligence guidelines;

    E.  Fidelity shall facilitate client communication and provide per event, per loan and portfolio specific reports to clients regarding Referral status;

    F.  Fidelity shall maintain loan data and documentation in client files and computer systems;

    G.  Fidelity shall facilitate judgment figure calculations, as applicable;

    H.  Fidelity shall calculate and process the VA 567 form and maintain the responsibility on providing this to the VA in the appropriate timeframes, when applicable;

Saxon 0198

## EXHIBIT A

### *FIDELITY NATIONAL FORECLOSURE SOLUTIONS  NETWORK SCHEDULE OF SERVICES*

SECTION II.   SERVICES PROVIDED BY FIDELITY TO THE FIRM

I.  Fidelity shall facilitate the calculations of all bids and provide them to the Firm in a timely manner;

J.  Fidelity shall prepare and mail all HUD Occupancy letters to the mortgagor, mortgagee and HUD, as applicable;

K.  Fidelity shall facilitate the ordering of all broker's price opinions and appraisals, and provide them to the appropriate parties, when applicable;

L.  Fidelity shall maintain all direct contact with the loan servicing customer and work with the customer on processing appropriate information requested by the mortgagor.  Such cases would include working with the collection/loss mitigation department on approval for Deed in Lieu's, short pays and repayment plans and the like;

M.  Fidelity shall maintain contact with investors, agencies, mortgage insurance companies and other appropriate signatory offices to obtain executed documents needed in the foreclosure, bankruptcy, or other action;

N.  Fidelity shall request all VA cut off extensions if advised by the Firm that we are unable to meet the required timeframes, when applicable;

O.  Fidelity shall request all HUD first action extensions if advised by the Firm that we are unable to meet the required timeframe, when applicable;

P.  Fidelity shall prepare and track the filing of any Proof of Claim required in an applicable bankruptcy;

Q.  Fidelity shall oversee the plan review process in connection with an applicable bankruptcy;

R.  Fidelity shall compile figures and financials for any bankruptcy Referral;

S.  Fidelity shall assemble the loan documents for any bankruptcy Referral;

T.  Fidelity shall compile, scan, and email all necessary information to the Firm;

U.  Fidelity shall monitor the status of an applicable motion for relief from stay;

V.  Fidelity shall assist in the research of billing inquiries and breakdowns;

W.  Fidelity shall order valuations, as applicable;

X.  Fidelity shall facilitate the calculation of post petition and contractual reinstatement figures;

Y.  Fidelity shall approve agreed order terms;

Z.  Fidelity shall track and monitor agreed order payments;

AA.  Fidelity shall track and review the final bankruptcy order;

BB.  Fidelity shall, when requested, close the client's bankruptcy tracking system;

CC.  Fidelity shall provide direction to the Firm for institution or reinstitution of a foreclosure action after the appropriate bankruptcy issues have been resolved to permit same, when applicable;

DD.  Fidelity shall monitor the status of a replevin action, when applicable;

EE.  Fidelity shall endeavor to standardize all processes and procedures requisite to managing defaulted loans from its multi-loan servicer, multi-platform customer base to provide operational and communication efficiencies to the Firm.

**Saxon 0199**

EXHIBIT B

FIDELITY NATIONAL FORECLOSURE SOLUTIONS
NETWORK FEES FOR SERVICES SCHEDULE FOR *MERITECH*

State: Texas
Firm: Mann & Stevens
Date: March 27, 2002

|  | Fees Billed to Client (Client Amount) | Fees Paid by Atty to Fidelity (Admin Fees)** |
|---|---|---|
| **I. Foreclosure Fees*** | | |
| A. Freddie Mac | $500.00 | $125.00 |
| B. FHA | $550.00 | $125.00 |
| C. VA | $550.00 | $125.00 |
| D. Fannie Mae | $550.00 | $125.00 |
| E. Other Loan Types | $550.00 | $125.00 |
| **II. Eviction Fees** | | |
| A. Freddie Mac | $300.00 | $75.00 |
| B. FHA | $300.00 | $75.00 |
| C. VA | Directed by VA | Directed by VA |
| D. Fannie Mae | $275.00 | $75.00 |
| E. Other Loan Types | $300.00 | $75.00 |
| **III. Deed in Lieu of Foreclosure** | | |
| A. Freddie Mac | $200.00 | $50.00 |
| B. FHA | $350.00 | $50.00 |
| C. VA | $350.00 | $50.00 |
| D. Fannie Mae | $350.00 | $50.00 |
| E. Other Loan Types | $350.00 | $50.00 |

* NOTE: For loans not subject to G.S.E. or Government Agency prescribed flat fees, FNMA fee caps will apply.

Uncontested Home Equity Judicial Foreclosures are $1,100.00 with a $125.00 Administrative Fee.

| **IV. Additional Requests** | | |
|---|---|---|
| A. Demand Letter (per letter) | $35.00 | $0.00 |
| B. Drafting Missing Documents | $0.00 | $0.00 |
| C. Title Claim Demand Letter | $125.00 | $0.00 |
| D. Lost Note Affidavit | $35.00 | $0.00 |

Saxon 0200

**EXHIBIT B**

FIDELITY NATIONAL FORECLOSURE SOLUTIONS
NETWORK FEES FOR SERVICES SCHEDULE FOR *MERITECH*

| | Fees Billed to Client (Client Amount) | Fees Paid by Atty to Fidelity (Admin Fees)** |
|---|---|---|
| E.   Nonstandard Per Hour Fee | $125.00 | $0.00 |
| F.   All Other Costs | Pass Through | $0.00 |
| **V. Bankruptcy Fees** | | |
| 1. Objection to Plan/Defense of Proof of Claim | | |
| a. Objection Resolved | $200.00 | $50.00 |
| b. File Review | $100.00 | $50.00 |
| 2. Motion for Relief: | | |
| (a) Mfr Complete | $600.00 | $150.00 |
| (b) Mfr prepped or filed | $400.00 | $100.00 |
| (c) File Review | $200.00 | $100.00 |
| 3. Motion for Relief (FHLMC Chapter 7) | | |
| (a) MFR Complete | $400.00 | $100.00 |
| (b) MFR prepped or filed | $300.00 | $100.00 |
| (c) File Review | $200.00 | $100.00 |
| 4. Agreed Order Default: | | |
| a. Notice of Default | * | * |
| b. Final Affidavit of Default | $0.00 | $0.00 |
| c. Ex Parte Order | $0.00 | $0.00 |
| 5. Additional Hearings, Per Hearing | $125.00 | $0.00 |
| 6. Hourly Fees (includes cramdowns) | $125.00 | $0.00 |

** Firm will not be invoiced for an admin fee on any FNMA or FHLMC file referred pursuant to the FNMA or FHLMC designated counsel program.

*To be paid by client from first cure funds sent by debtor

Approved and Agreed to by *D̶e̶ /*
*Diana Etala Stevens,*
*for Mann + Stevens, P.C*

**Saxon 0201**

**EXHIBIT C**
*FIDELITY NATIONAL FORECLOSURE SOLUTIONS NETWORK MODIFIED FEE SCHEDULE*

STATE:    Texas
FIRM:     Mann & Stevens ("Firm")
DATE:    October 2, 2007

If Fidelity provides the Firm with either written or oral notice to stop a foreclosure at any time prior to the sale of the real property being completed, then the Fees paid to the Firm pursuant to Exhibits B shall be modified as outlined in this schedule. **THE FIRM WILL BE BILLED THE FULL ADMINISTRATIVE FEE REGARDLESS OF WHEN THE FORECLOSURE IS TERMINATED OR TRANSFERRED.**

SECTION I.    FEES FOR NON-JUDICIAL FORECLOSURES

| Event | Modified Fee |
|---|---|
| A.    File received by Firm and title ordered/received | 30% of the fee described in Exhibits B & C |
| B.    Foreclosure documents prepared, service is awaiting publication/posting | 60% of the fee described in Exhibits B & C |
| C.    Up to and including publication started | 90% of the fee described in Exhibits B & C |

SECTION II.    FEES FOR JUDICIAL FORECLOSURES

| Event | Modified Fee |
|---|---|
| A.    File in, up to and including title ordered/received | 30% of the fee described in Exhibits B & C |
| B.    Up to and including complaint drafted/sent/filed | 50% of the fee described in Exhibits B & C |
| C.    Up to and including service started/completed | 70% of the fee described in Exhibits B & C |
| D.    Up to and including judgment sent/entered | 90% of the fee described in Exhibits B & C |

**Saxon 0202**